IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAMARA T. KING, on behalf of herself and all others similarly situated,<br>  Plaintiffs,<br><br>v.<br><br>GENERAL INFORMATION SERVICES, INC.,<br>  Defendant. | :<br>:<br>:<br>:  CIVIL ACTION<br>:<br>:  NO. 10-6850<br>:<br>:<br>:<br>:<br>: |

## MEMORANDUM OPINION

**Tucker, J.**                                                                                     **November___, 2012**

      Presently before the Court is Defendant General Information Services, Inc.'s Motion for Judgment on the Pleadings (Doc. 40); Plaintiff Shamara King's Response in Opposition thereto (Doc. 46); the United States' Response in Opposition thereto (Doc. 52); and Defendant's Reply (55). For the reasons set forth below, this Court will deny Defendant's motion.

## BACKGROUND

      The Fair Credit Reporting Act, 15 U.S.C. §§ 1681 – 1681x ("FCRA"), regulates the collection, maintenance, and disclosure of consumer reports by consumer reporting agencies, including public record information. Section 1681c of the FCRA provides requirements relating to information contained in consumer reports. 15 U.S.C. §1681c. When a consumer reporting agency produces a copy of a consumer's report to the consumer or a third-party, the consumer reporting agency is required to exclude, *inter alia*, "adverse items of information, other than records of convictions of crimes which antedates the report by more than seven years." 15

U.S.C. § 1681c(a)(5).  The statute also provides that consumer reporting agencies must exclude records of arrest that antedate the report by more than seven years.  15 U.S.C. § 1681c(a)(2).  Nevertheless, there are limited instances in which a consumer reporting agency may report these outdated items of information.  This statutory exemption applies to (1) credit transactions involving a principal amount of $150,000 or more; (2) the underwriting of life insurance involving a face amount of $150,000 or more; and (3) the employment of an individual at an annual salary which equals, or which may be reasonably expected to equal $75,000 or more.  15 U.S.C. §1681c(b).

General Information Services, Inc. ("GIS" and "Defendant") is a consumer reporting agency, as defined by section 1681a(f) of the FCRA,[1] that investigates and reviews public record databases and maintains consumer files which contain public record information concerning, among other things, the criminal history of individuals.  From its files, GIS sells consumer reports to potential employers wishing to investigate the criminal record history, or lack thereof, with regard to various job applicants.

In or around early 2010, representative plaintiff, Shamara King ("Ms. King" and "Plaintiff") applied for a job with the United States Postal Service.  In connection with Ms. King's application, the Postal Service ordered a background check from GIS.  GIS sold to the Postal Service a background check consumer report on Ms. King that included ten nolle prossed charges she received in July, 2000 after an arrest for a criminal incident.  Ms. King's consumer report also disclosed an inaccurate charge date and arrest date for the offense, and failed to state

---

[1] Section 1681a(f) defines consumer reporting agency "as any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  15 U.S.C. 1681a(f).

her hair color.  On or about March 4, 2010, GIS mailed Ms. King a copy of the consumer report that was earlier sent to the Postal Service.

The present action was brought by Ms. King, on behalf of herself and others similarly situated, against GIS for its alleged failure to comply with section 1681c of the FCRA by maintaining a policy and practice of willfully reporting outdated adverse public information, including records of arrest, that is required to be excluded from the consumer reports that it sells.[2]  Ms. King specifically alleges that GIS violated section 1681c when disclosing her 10-year old nolle prossed charges to the Postal Service.  Accepting all of the facts alleged in the Complaint as true, GIS now challenges the constitutionality of section 1681c.[3]

## LEGAL STANDARD

### a.  Judgment on the Pleadings pursuant to Rule 12(c)

Defendant moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), stating that section 1681c of the FCRA is unconstitutional.  The standard of review for a Rule 12(c) motion is similar to the standard invoked for consideration of a Rule 12(b)(6) motion.  As with a Rule 12(b)(6) motion, this Court views the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the non-moving party.  *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F. 2d 289, 290-91 (3d Cir. 1988)).  The motion is not granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law.  *Mele v. Fed. Reserve Bank*, 359 F.3d 251, 253 (3d Cir. 2004)

---

[2]  Plaintiff King also asserts a claim against GIS for the willful violation of section 1681k of the FCRA, which governs public record information for employment purposes.  Because GIS does not move for judgment on this claim, it is not the focus of this motion.
[3]  The United States of America was permitted to intervene in this case to defend the constitutionality of section 1681c.

(quoting *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002)).

## **DISCUSSION**

a. **Procedural Arguments**

As a preliminary matter, "it is well established that courts have a duty to avoid passing upon a constitutional question if the case may be disposed of on some other ground." *Spicer v. Hilton*, 618 F.2d 232, 239 (3d Cir.1980) (quoting *Hagans v. Lavine*, 415 U.S. 528, 543 (1974)). In view of such, Plaintiffs argue for dismissal of Defendant's Motion on two procedural grounds. First, Plaintiff contends that Defendant's constitutional challenge should be dismissed for failure to raise such an argument in its two preliminary motions pursuant to Rule 12(b)(6). Second, Plaintiff contends that judgment on the pleadings pursuant to Rule 12(c) is inappropriate because basic allegations that go to the heart of this dispute were denied by Defendant in its Amended Answer. Both procedural arguments fail.

While Rule 12(g)(2) provides that "a party that makes a motion under this rule must not make another motion under the rule raising a defense or objection that was available to the party but omitted from its earlier motion," Rule 12(h)(2)(B) states, "[f]ailure . . . to state a legal defense to a claim may be raised . . . by motion under Rule 12(c)." Because Defendant's constitutional challenge to section 1681c of the FCRA is a legal defense, such defense was properly raised by a Rule 12(c) motion. Further, there are no material issues of fact barring Defendant from moving for judgment on the pleadings. In its Motion, Defendant asserts that it accepts all facts pleaded in Plaintiff's Complaint as true. Moreover, the "materiality" of the disputed facts that Plaintiff points to for support are wholly dependent upon whether section 1681c is constitutional. As such, this Court is now faced with deciding the constitutionality of section 1681c.

b. **First Amendment**

GIS challenges section 1681c of the FCRA on First Amendment grounds, arguing that the provision's restriction on the dissemination of truthful commercial information cannot survive the "heightened" constitutional scrutiny endorsed and applied by the Supreme Court in its recent decision, *Sorrel v. IMS Health, Inc.*, 131 S.Ct. 2653 (2011). GIS contends that the *Sorrel* decision marks a major shift in the protection afforded to commercial speech, which now requires this Court to apply a stricter standard of review than the one typically applied. Both Plaintiff and the Government refute GIS's claim, asserting that the *Sorrel* decision does not change the commercial speech inquiry as applied in *Central Hudson Gas & Elect. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980), and that section 1681c's restriction on truthful commercial information passes constitutional muster. Before determining whether section 1681c is constitutionally valid, the Court must first decide where this type of restriction falls on the scale of First Amendment values and whether such position has been altered by the *Sorrel* decision.

i. **Nature of Speech at Issue**

The Supreme Court has made clear that consumer report information is "speech" under the First Amendment. *See Dun & BradStreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985); *Trans Union Corp. v. F.T.C.,* 245 F.3d 809 (D.C. Cir. 2001), *cert. denied*, 536 U.S. 915 (2002). However, the degree of First Amendment protection accorded to consumer report information turns on whether the particular information is of public or private concern. In *Dun & Bradstreet*, the Supreme Court explained that such a determination "depends on whether the report's content, form, and context indicate that it concerns a public matter." 472 U.S. at 762 n.8. Where the information is "solely in the interest of the speaker and its specific business

audience" and made available to a limited number of subscribers, the credit report information concerns no public issue and therefore warrants a reduced First Amendment protection. *Id.*

Applying these principles to the case at hand, this court finds that the consumer report information disseminated by GIS concerns purely private matters. The very fact that GIS compiles consumer reporting information for the purpose of making a profit and its business customers purchase such reports in order to make business decisions supports the proposition that the dissemination of this information is of sole interest to the speaker (GIS) and its audience (business customers). Moreover, like the consumer reports in *Dun & Bradstreet*, GIS' consumer reports are made available to the paying subscriber only. As such, the private nature of these consumer reports does not significantly contribute to public dialogue and, accordingly, this Court finds that such information warrants a reduced constitutional protection.

  ii. ***Sorrel*'s Impact on the Commercial Speech Inquiry**

The appropriate test for analyzing the reduced First Amendment protection accorded to consumer report information is the Supreme Court's commercial speech doctrine.[4] *See Trans Union Corp. v. F.T.C.*, 267 F.3d 1138 (D.C. Cir. 2001) ("Trans Union II"), *denying rehearing of* 245 F.3d 809 ("Trans Union I")) (invoking the commercial speech doctrine to conclude that consumer reports produced by consumer reporting agencies merit only intermediate scrutiny). Recognizing the "distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech," *Central Hudson*, 447 U.S. at 562, the Supreme Court developed a framework for analyzing regulations of commercial speech:

---

[4] All parties agree that section 1681c restrains "truthful commercial information" and that the appropriate test to be applied to such provision is whether the provision directly advances a substantial governmental interest in a manner that prevents excessive restrictions on the freedom of speech.

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

*Id.* at 566.

The standard of review articulated in *Central Hudson*, and long applied by federal courts, is intermediate scrutiny.[5] Yet, the Defendant urges this Court to apply strict scrutiny, in light of the *Sorrel* decision. According to GIS, the *Sorrel* decision now requires federal courts to apply a standard stricter than *Central Hudson*'s where the regulation creates a content- and speaker-based restriction on commercial speech. For support, GIS specifically points to the fact that the Supreme Court declined to decide whether the Vermont law hampered commercial speech or ordinary speech because the outcome was the same regardless of the level of scrutiny. *See Sorrel*, 131 S. Ct. at 2667. By the Court declaring that "the outcome is the same" whether a special commercial speech inquiry or a stricter form of judicial scrutiny (strict scrutiny) is applied, GIS asserts that *Sorrel* marks a substantial shift in the protection afforded to commercial speech and, consequently, overhauls the well-embedded *Central Hudson* test. This Court disagrees.

Certainly, the *Sorrel* decision reaffirms the core meaning of the First Amendment and attempts to guide lawmakers trying to protect privacy interest without unduly suppressing

---

[5] The Supreme Court has explicitly stated that they "engage in 'intermediate' scrutiny of restrictions on commercial speech, analyzing them under the framework set forth in *Central Hudson*." *Fla. Bar v. Went For It*, 515 U.S. 618,623 (1995). Admittedly, some Supreme Court Justices have openly rejected the *Central Hudson* test in favor of some stricter scrutiny. See, e.g., *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 517-518 (Scalia & Thomas , JJ., concurring). However, this difference of opinion demonstrates that "reasonable judges may disagree about the merits of such proposals." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 175 (1999). To date, the Supreme Court has found "no need to break new ground" and, consequently, continues to look to *Central Hudson's* intermediate scrutiny test as the gold standard.

7

speech. However, the Supreme Court stopped far short of overhauling nearly three decades of precedent, which is clearly demonstrated by the fact that the opinion characterizes commercial speech precedence, including *Central Hudson* itself, for support. *See Sorrel*, 131 U.S. at 2664 (characterizing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418 (1993), a case applying the *Central Hudson* test for restrictions on commercial speech, as "applying heightened scrutiny."); *see also id.* at 2667-68 (citing to *Central Hudson* when explaining the commercial speech inquiry to be applied). This alone is enough to find that the typical commercial speech inquiry under intermediate scrutiny remains valid law. If the Court wished to disrupt the long-established commercial speech doctrine as applying intermediate scrutiny, it would have expressly done so. Absent express affirmation, this Court will refrain from taking such a leap.

Furthermore, the *Sorrel* decision is particular to the *Sorrel* facts. *Sorrel* features the clashing interests of the State of Vermont and the pharmaceutical industry during a period of spiraling healthcare costs. In an effort to reduce its growing healthcare expenditures, Vermont embarked on a targeted cost-containment campaign and enacted a statute that unambiguously regulated the use of prescriber identifying information in order to curb the use of brand name drugs. 131 S. Ct. at 2660-61. The Supreme Court found that, "[t]he law on its face burden[ed] disfavored speech by disfavored speakers" and "ha[d] the effect of preventing detailers – and only detailers – from communicating with physicians in an effective and informative manner." *Id.* at 2663. Although the Court found that Vermont's policy goals of lowering medical costs and protecting public health were proper, the State's attempt to burden speech in order to "tilt public debate in a preferred direction" and discourage demand for a particular disfavored product (brand name drugs) was unconstitutional. *Id.* at 2671. Hence, the *Sorrel* decision largely rested on the fact that Vermont was restraining a certain form of speech communicated by a certain

speaker solely because of the State's disagreement with it.  Moreover, the commercial speech restriction at issue involved a matter of public concern.  Accordingly, the Supreme Court correctly noted that such a law conflicted with First Amendment principles so much that it would be constitutionally invalid whether a special commercial speech inquiry or a more heightened form of analysis was applied.

The instant matter, however, has nothing to do with the federal government trying to "tilt the public debate" in order to favor one form of speech over another.  Here, the federal government enacted section 1681c of the FCRA to provide businesses with the most accurate and relevant information while simultaneously protecting the privacy rights of consumers.  More important, section 1681c's speech restriction is appropriately justified.  The *Sorrel* Court did not take issue with Vermont's law merely because it imposed a content- and speaker-based restriction on commercial speech, but because its restriction could not be justified on neutral grounds.  *See Sorrel*, 131 S. Ct. at 2672 ("It is true that content-based restrictions on protected expression are sometimes permissible . . . Here, however, Vermont has not shown that its law has a neutral justification.").  Accordingly, this Court is not persuaded by GIS's argument and now proceeds under the commercial speech inquiry as applied in *Central Hudson*.

    iii.  **Commercial Speech Inquiry**

The constitutionality of section 1681c turns on whether the provision directly advances a governmental interest in a manner that prevents excessive restrictions on the freedom of speech.[6] Determining whether a law "directly advances" an interest in a way that is "no more extensive than necessary" essentially "'involves[s] a consideration of the 'fit' between the legislature's

---

[6] The first two prongs of the Central Hudson test are not at issue in this case.  All parties agree that section 1681c implicates "speech" that is neither misleading nor related to unlawful activity, and that the Government's stated interests are substantial.

ends and the means chosen to accomplish those ends.'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486 (1995) (quoting *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986)). That "fit" between a legislature's goal and the means chosen to accomplish that goal need "not necessarily [be] perfect, but reasonable," and the law's scope must be "in proportion to the interest served." *Bd. of Trs. of SUNY v. Fox*, 492 U.S. 469, 480 (1990).

The stated purpose of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce . . . in a manner which is fair and equitable to the consumer."  15 U.S.C. § 1681(a)(4).  In other words, Congress' interest is two-fold: to meet the needs of businesses while at the same time ensuring consumer privacy.[7] Congress achieves such a balance between the competing yet equally important interest through a variety of provisions that simultaneously make consumer report information available to businesses, but limit the type of information being reported and the circumstances in which it may be reported.  In striking the most appropriate balance between business needs and consumer privacy, Congress necessarily weighs the significance of "confidentiality, relevancy, and proper utilization of such information."  15 U.S.C. §1681(b).

The disclosure requirements of section 1681c embody Congress' dual interests in meeting business needs and protecting consumer privacy.  By barring consumer reporting agencies from disclosing adverse pieces of information after a certain period of time, section 1681c directly advances the governmental interest in protecting individuals' privacy in potentially harmful and embarrassing information.  As the Government points out, the Third

---

[7] GIS points to the remarks of FCRA sponsor, Senator Proxmire, to suggest that section 1681c is supported by three governmental interests: relevancy, privacy, and accuracy.  This assertion is flawed.  Congress' explicit purpose for enacting the FCRA is to draw an appropriate line between the competing interests of consumers and businesses.  To ensure that this line is properly drawn, Congress considers factors such as relevancy and accuracy.  Such additional factors, however, do not amount to a freestanding governmental interest.

Circuit has recognized that individuals' privacy interest can be not only substantial but compelling where disclosure of information could inflict serious reputational injury and even be "career ending." *United States v. Smith*, 776 F.2d 1104, 1114 (3d Cir. 1985) (affirming decision to deny the press access to a list of unindicted co-conspirators, concluding that protecting those individuals' privacy and reputations trumped the media's First Amendment right to access).

At the same time, however, Congress also advances its substantial interest in meeting the needs of businesses by permitting this excluded information to be furnished in certain exceptional cases: in financial transactions of more than $150,000 and in employment situations with an annual salary of more than $75,000. Balanced against the substantial interest of consumer privacy, the FCRA permits exemptions from the general rule of non-disclosure in circumstances where businesses are faced with high-stake decisions, such as extending a higher paying job or high value loan. As such, the balance is shifted from broad protection of consumer privacy to an allowance of commercial information in these higher-stake situations.

However, to pass constitutional muster, section 1681c of the FCRA must also be narrowly tailored to achieve this desired balance between competing interests. In previous cases addressing this final prong of the *Central Hudson* test, the Supreme Court has made clear that "if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Thompson v. Western States Medical Ctr.,* 535 U.S. 357, 371 (2002). In *Thompson*, the Supreme Court invalidated a provision of the Food and Drug Administration Modernization Act of 1997 ("FDAMA") that exempted compounded drugs from drug approval requirements as long as the providers of those drugs refrained from advertising particular compounded drugs. *Id.* at 377. The Court found that the Government could advance its interest in achieving a proper balance between preserving the effectiveness of

the drug approval process and preserving the availability of compounded drugs by restricting the conduct, rather than the speech, of pharmacists. *Id.* at 371-72. Providing several non-speech-related means of drawing a line between the competing governmental interests, the Court concluded that "[i]f the First Amendment means anything, it means that regulating speech must be a last – not a first – resort." *Id.* at 373.

Here, the Government submits that section 1681c's speech restriction is the only means to addressing its asserted interest because "'the speech itself (dissemination of . . . data) causes the very harm the government seeks to prevent'" (invasion of privacy)." Government's Brief 11 (citing *Trans Union II*, 267 F.3d at 1142). Given the fact that Congress seeks to protect individuals' personal privacy in potentially harmful information, restraining the dissemination of such information under appropriate circumstances is a reasonable step towards achieving such an objective. GIS, on the other hand, suggests that the Government's interest can be advanced by a less-restrictive or non-speech-related regulation by simply declining to make criminal records public in the first place. GIS asserts that "'if there is an option that achieves the same goals and does not restrict speech, the government must choose that option.'" Defendant's Brief at 10 (citing *Thompson*, 535 U.S. at 373). However, the mere fact that an "alternative" exists does not mean that the Government's means are not narrowly tailored. The Supreme Court has made clear that the restriction must not be the "least restrictive" restriction but one with a "reasonable fit." *Posadas de P.R. Assocs.*, 478 U.S. at 341. Moreover, GIS fails to acknowledge that the alternative must not only achieve the same goal, but must do so "in a manner that is less intrusive to First Amendment rights." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490-491 (1995). An absolute restriction on the dissemination of arrest records creates a "greater, not lesser, burden" on First Amendment rights. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. at

564-65 (invalidating a regulation that sweeps more broadly than necessary to accomplish its goal). As such, GIS's alternative is not an option that the Government must choose.

GIS also challenges the "fit" between the legislature's goal and means, arguing that the Government's privacy rationale is undermined by section 1681c's regulation of public records. GIS specifically argues that the Government cannot punish private parties for disseminating information that the Government itself has made publicly available. GIS contends that "'once truthful information was publicly revealed or in the public domain [the government] could not constitutionally restrain its dissemination." Defendant's Brief 12 (citing *Smith v. Daily Mail Publishing Co.*, 443 U.S 97, 103 (1979). This argument, however, fails to take into consideration the real identity of these public records when disseminated by consumer reporting agencies. "Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 764 (1989). Indeed, "the very fact that [private] funds have been spent to prepare, index, and maintain these criminal-history files demonstrates that the individual items of information in the [consumer reports] would not otherwise be 'freely available'" to GIS' business customers or the general public. *Id.* Moreover, the mere fact that an individual piece of information may be found in a public record does not mean that it should receive widespread publicity if it does not involve a matter of public concern. *Id.* at n.15. Such a "cramped notion of personal privacy" ignores an individual's interest in maintaining the "practical obscurity" of cumulative, indexed, computerized data.

Additionally, the legislature's decision to narrow the scope of section 1681c by

permitting a limited number of exceptions to the general rule does not prevent the provision from meaningfully advancing the Government's goals. Agreeing with the Government's position, section 1681c's prohibition is not absolute because the provision balances the Government's dual interests: protecting individuals' privacy against businesses' competing interest in obtaining information about people to whom they might offer a loan, a job, or an insurance policy. Accordingly, the provision creates exemptions where Congress determined that businesses' interest in full information outweighed individuals' privacy interests. These exceptions, however, are not so broad as to undermine the law's effectiveness. Neither are these exceptions "arbitrary" like in *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173 (1999), where the challenged statute was "pierced by inconsistences." Congress carves out these limited exceptions based on a proper balance between competing yet equally important interests. Mere disagreement with the balance that is struck will not lead this Court to second-guess a congressional decision.

It is also important to note that evaluated in the context of the entire regulatory scheme, section 1681c's speech restriction is part of a "more coherent policy" than the policies at issue in *Sorrel* and *Greater New Orleans*. GIS attempts to persuade the Court that this provision reflects a content or viewpoint preference by targeting the speech of only a single, disfavored group (consumer reporting agencies) while still permitting employers to consider outdated, adverse information provided by other countless sources of information. This argument is flawed.

Congress' restrictions on the use of criminal arrest records extend beyond section 1681c and the entire FCRA. These restrictions, however, are applied in a coherent manner through Congress' mandate that anyone who receives a consumer report certify that they will not use the report in violation of any "Federal and State equal employment opportunity law or regulation."

15 U.S.C. § 1681b(b)(1)(A)(ii). Accordingly, this provision acknowledges the various state and federal laws that forbid employers from considering criminal arrest records in employment decisions. To demonstrate this point, the plaintiff points to several sources restricting the use of criminal arrest records by employers. Plaintiff's Brief 12-13. For example, Title VII of the Civil Rights Act of 1964 restricts blanket policies excluding from employment individuals with criminal records as impermissible race discrimination. 42 U.S.C. § 2000e, *et seq*. This restriction was made explicit in the Equal Employment Opportunity Commission's 1990 policy guidance on consideration of arrest records, which states, "a blanket exclusion of people with arrest records will almost never withstand scrutiny." U.S. Equal Employment Opportunity Commission, *Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964*, as amended 42 U.S.C. § 2000e, *et seq*., N-915-061 (September 7, 1990).

From a local level, many states have placed limits on how employers may use criminal background checks. In Pennsylvania, employers are allowed to consider an applicant's felony and misdemeanor convictions, but not mere arrests, in connection with hiring decisions. 18 Pa.C.S. § 9125, part of the Criminal History Record Information Act, 18 Pa.C.S. § 9101- 9181; *see also Commw. of Pa. v. D.M.*, 695 A.2d 770, 773 n.2 (Pa. 1997). Additionally, the growing trend of "ban the box" legislation that has been enacted in states, as well as local municipalities, also exemplifies this national effort towards restricting both the dissemination and consideration of adverse information that is potentially harmful to an individual's economic opportunities.[8]

---

[8] A growing number of states, cities, and counties are removing barriers to employment for individuals with criminal records. Some of the states include California, Connecticut, Hawaii, Massachusetts, and Minnesota, along with a number of major cities including Philadelphia, Chicago and Baltimore. *See* National Employment Law Project, *Ban the Box: Major U.S. Cities and Counties Adopt Fair Hiring Policies to Remove Unfair Barriers to Employment of People with Criminal Records* (July 20, 2011).

The fact that Congress leaves unregulated other sources of the same information, or even permits employers to consider adverse items of information in limited circumstances, does not prevent it from meaningfully advancing its governmental interests. The FCRA's focus on consumer reporting agencies is attributed to the vital role of such agencies "in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3); *see also* S. Rep. No. 91-517, at 2 (1969) (explaining that members of one major credit bureau trade association "maintain[ed] credit files on more than 10 million individuals and in 1967 . . . issued over 97 million credit reports"). Indeed, "[g]iven consumer reporting agencies' unique access to a broad range of continually-updated, detailed information about millions of consumers' personal credit histories, we think it not at all inappropriate for Congress to have singled out consumer reporting agencies for regulation." *Trans Union I*, 245 F.3d at 819. Targeting a major source, rather than every conceivable source, of potentially harmful information is consistent with First Amendment standards. *See Mariani v. United States*, 212 F.3d 761, 774 (3d Cir. 2000) ("The requirement that the regulation alleviate the harm in a direct and material way is not a requirement that it redress the harm completely.").

Finally, the fact that Congress singles out this major source of consumer information does not necessarily mean that such source is "disfavored." GIS's eager attempt to color section 1681c with the same flaws of the Vermont statute in *Sorrel* is misplaced. As previously noted, section 1681c was not enacted in order to tilt the public debate in a preferred direction or to simply favor one speaker over the other. Congress' decision to single out consumer reporting agencies was explicitly based on their unique impact on American commerce and personal privacy. Through a coherent policy that has been justified on such neutral grounds, this Court finds section 1681c to sufficiently comport with First Amendment standards.

## **CONCLUSION**

Based on the foregoing reasons, Defendant GIS's Motion for Judgment on the Pleadings is denied.  An appropriate order is attached.